# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

KENNETH MCCLENDON,

    Plaintiff,

    v.                      **Case No. 23-CV-1091**

MARTIN J. O'MALLEY,
Commissioner of Social Security,

    Defendant.

---

## DECISION AND ORDER

---

Kenneth McClendon seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his Title XVI application for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons explained below, the Commissioner's decision is affirmed, and the case is dismissed.

## BACKGROUND

On May 20, 2019, McClendon filed an application for supplemental security income alleging disability beginning on June 16, 2011 due to a learning disability, chronic anxiety, significant noise intolerance, seizures, speech delay, and G6PD deficiency. (Tr. 203.) McClendon's application was denied initially and upon reconsideration. (Tr. 12.) McClendon filed a request for a hearing, and a hearing was held before Administrative Law Judge ("ALJ") Patrick Berigan, on October 8, 2020. (Tr. 33.) McClendon, who was represented by counsel, testified, as did McClendon's mother, Linder McClendon, and Emily Veith, a vocational expert ("VE"). (Tr. 33–63.)

In a written decision issued November 30, 2020, ALJ Berigan found that McClendon had the severe impairments of a language disorder, reading disorder, adjustment disorder with mixed anxiety and depressed mood, and headaches. (Tr. 14.) The ALJ found that McClendon did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 15–16.) ALJ Berigan found that McClendon had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: never climb ladders, ropes, or scaffolds; never use unprotected moving machinery or be exposed to unprotected heights; limited to simple tasks requiring no more than two hours of continuous concentration; limited to a low stress job, defined as having only occasional decision making and occasional changes in work setting; and limited to occasional interaction with co-workers, supervisors, and the public. (Tr. 16.)

ALJ Berigan found that although McClendon had no past relevant work, given his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform. (Tr. 26–27.) Thus, the ALJ found McClendon was not disabled from the application date of May 20, 2019. (Tr. 28.) The Appeals Council denied McClendon's request for review (Tr. 2–7) and McClendon appealed the decision to this Court in *McClendon v. Kijakazi*, Case No. 21-CV-466 (E.D. Wis. Apr. 13, 2021) (Tr. 620–22.)

The parties jointly stipulated to remand the action to the Commissioner for further proceedings (Tr. 625–26), and the case was remanded in an order dated March 4, 2022 (Tr. 624). On August 22, 2022, the Appeals Council remanded McClendon's case to an ALJ for a new hearing and decision. (Tr. 584–86.) A second hearing was held before ALJ Chad Gendreau on March 23, 2023. (Tr. 550–72.) McClendon, again represented by counsel,

testified, as did Heather Mueller, a vocational expert. (Tr. 550.) In a written decision issued April 27, 2023, ALJ Gendreau found that McClendon had the severe impairments of a cognitive disorder, sound sensitivity disorder, headaches, depression, and anxiety. (Tr. 528.) He found that McClendon did not have an impairment or combination of impairments that met or medically equaled one of the Listings. (Tr. 528–29.) In re-assessing his RFC, ALJ Gendreau also determined that McClendon could perform a full range of work at all exertional levels, but with these nonexertional limitations: cannot climb ladders, ropes, and scaffolds; cannot work at unprotected heights or in vibration; must work in no more than a moderate level of noise; can hear and understand simple oral instructions and communicate simple information; can perform simple, routine, and repetitive tasks; can make simple, work-related decisions; can occasionally interact with supervisors and co-workers; and can have only fleeting or incidental contact with the general public, with no public facing work. (Tr. 529.)

ALJ Gendreau found that although McClendon had no past relevant work, given his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform. (Tr. 541–42.) Thus, ALJ Gendreau also found McClendon was not disabled from the application date of May 20, 2019. (Tr. 543.) McClendon did not file a Statement of Exceptions following the denial, and the Appeals Council declined to assume jurisdiction. Thus, ALJ Gendreau's decision became the final decision of the Commissioner. This current action follows.

## DISCUSSION

### 1.    *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal

standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to This Case*

McClendon argues that the ALJ erred by failing to incorporate all of his limitations due to headaches, sound sensitivity, and social difficulties in the RFC. He further argues that the ALJ improperly discounted his subjective symptoms. I will address each argument in turn.

### 2.1 McClendon's Medical History

When McClendon was two days old, he suffered multiple seizures. (Tr. 334.) A subsequent CT scan showed a small area of increased attenuation in the posterior horn of the

right ventricle. (*Id.*) McClendon was treated in the hospital and discharged approximately two weeks later. (*Id.*) Medication was discontinued when McClendon was approximately five months old and the seizures never recurred. (*Id.*)

In May 2009, when McClendon was seventeen years old, his treating physician, Dr. Matthew Solberg, noted that while McClendon was enrolled in special education classes at school, that he was performing strong in science and art. (Tr. 1633.) McClendon reported experiencing headaches in the front and temple regions that worsened with exercise and loud music or noise. (*Id.*) In March 2010, McClendon again treated with Dr. Solberg for evaluation of recurring headaches. (Tr. 1625.) McClendon complained of bilateral headaches, often associated with lightheadedness, for the past ten months, occurring about once a month. (*Id.*) Tylenol helped temporarily. (*Id.*) Dr. Solberg felt that McClendon's headaches were not migraines and noted that McClendon was not drinking enough fluid, which likely contributed to the headaches. (Tr. 1626.) McClendon followed-up with Dr. Solberg the following month and reported that he was drinking 60 ounces of fluids per day and had not experienced a headache in the past three weeks. (Tr. 1622.)

The following year, in June 2011, McClendon sought treatment for headaches with Dr. Hanumantha Rao Kothur. (Tr. 1612.) McClendon reported frontal headache and nausea persisting for five days; Dr. Kothur advised McClendon to consult with a neurologist and obtain a CT scan of the head. (Tr. 1613.) A June 11, 2011 MRI of the brain showed a nonspecific 1 cm lesion in the left frontal lobe. (Tr. 1568.) In July 2011, McClendon presented to neurologist Dr. Elizabeth Marriott for a consultation regarding his headaches. (Tr. 1565.) McClendon reported that in June he was having persistent, daily, headaches lasting several weeks. (*Id.*) The headaches would sometimes worsen with activity and were worsened by

bright lights. (*Id.*) McClendon also reported feeling generally weak and mildly dizzy. (*Id.*) He was given Tramadol for the pain, which was helpful. (*Id.*) McClendon reported that he did not presently have a headache and had not experienced a headache for a few weeks. (*Id.*) Dr. Marriott recommended observation, NSAIDs, preventative therapy, and a repeat MRI study in six months. (Tr. 1568.)

In August 2011, McClendon's mother requested that Dr. Marriott write a letter regarding how McClendon's condition affects his speech for her son's job placement program. (Tr. 1560–61.) Dr. Marriott provided a letter, dated August 15, 2011, opining that McClendon's history of seizures as an infant left him with some irrevocable damage to the left hemisphere of his brain, contributing to his delay in speech. (Tr. 333.) She noted that while his speech has improved with intensive therapy and speech assistance, he would always have some component of delay in expressing speech. (*Id.*) On August 29, 2011, Dr. Marriott noted that McClendon's headaches were "okay" and that he had only experienced one since his last visit on July 11. (Tr. 1548.) McClendon reported that he took Tylenol with relief and that the headaches were not getting worse. (*Id.*)

In September 2011, McClendon treated with Dr. Gregory Buck for a routine physical. (Tr. 1540.) McClendon reported "infrequent headache" and that aspirin provides some relief while Tramadol did not. (Tr. 1542.) In October, McClendon underwent a two-day neuropsychological examination with David DuBord, Psy.D. (Tr. 809.) In recounting McClendon's medical history, Dr. DuBord noted that while McClendon began experiencing headaches at the age of nineteen, his headaches had decreased in number and intensity. (Tr. 810.) On mental status examination, Dr. DuBord noted that McClendon's speech was greatly slowed and that he occasionally slurred some words. (*Id.*) His expressive responses to verbal

questions and reception of verbal instructions were both slowed and his typical response was "to stare rather blankly, and to not acknowledge if he heard or understood the question." (*Id.*) Dr. DuBord concluded McClendon had a verbal learning disability and that his slowing of response time could cause difficulties with interpersonal communication. (Tr. 812.) Dr. DuBord recommended a learning and/or workplace environment that allowed for such accommodations as extra time for lengthy assignments, a distraction-free test environment, one-on-one teacher assistance, and modified assignments and tests. (Tr. 813.)

In November 2011, McClendon underwent a psychological evaluation with James Paquette, Ph.D. (Tr. 314.) Dr. Paquette concluded that McClendon was a "very pleasant gentleman" who attended the Milwaukee Area Technical College and was receiving B's and C's in his courses. (Tr. 317.) He noted that McClendon "no longer complains of debilitating headaches, his most recent in June or July 2011." (*Id.*) Dr. Paquette found that McClendon's current assessment did not "identify expressive-receptive language impairments or stuttering sufficiently debilitating to generate a diagnosis" and that "mood, anxiety, and thought disorder symptoms [were] not evident." (*Id.*) Dr. Paquette opined McClendon "would be able to work adequately." (*Id.*)

McClendon did not treat again until February 2013. (Tr. 1513.) He reported to Dr. Buck chronic intermittent monthly headaches but noted some relief with aspirin. (Tr. 1515–16.) McClendon underwent another mental status evaluation on July 23, 2013 with John Juern, Ph.D. (Tr. 318.) Dr. Juern noted that he "became very much aware of the fact that [McClendon] [was] slower at processing information. When a question [was] asked of him, there [was] a pause. It would seem as if his brain [was] having to process that question and then come up with an answer to that question." (Tr. 320.) However, Dr. Juern ultimately

7

opined that McClendon would be able to hold a job, as he was presently taking classes and doing well in school. (Tr. 323.) Dr. Juern noted that the "only difficulty" McClendon may have is with attention and concentration; however, "even that does not appear to be a significant problem." (*Id.*) McClendon underwent a speech and language evaluation by speech language pathologist Maura Moyle, Ph.D. on July 30, 2013. (Tr. 325.) Dr. Moyle noted that while McClendon exhibited long pauses before responding to questions, he appeared to have functional communication skills. (Tr. 327.) She opined that McClendon could perform basic job duties "given a high level of supervision and accommodations for his processing difficulties." (*Id.*)

McClendon treated with Dr. Venkatarama Rao on August 8, 2014. (Tr. 1481.) Dr. Rao noted that McClendon thought he "might have headaches," but was not very clear. (*Id.*) Later that month, McClendon reported to Dr. Buck that he occasionally felt despondent and had difficulty sleeping, and also experienced periodic muscle tension headaches made worse by sinus congestion and looking at a computer screen for much of the day. (Tr. 1476–77.) Over a year later, on October 12, 2015, McClendon reported to Dr. Buck experiencing "periodic" headaches for which he took acetaminophen or ibuprofen as needed with relief. (Tr. 1466.)

In June 2016, McClendon presented to Dr. Buck for evaluation of left-sided headache appearing several times per week for the past several months. (Tr. 1454.) McClendon reported no relief with over-the-counter analgesics. (*Id.*) He stated that headaches appeared when he had not been sleeping enough, when angry, or when doing too much work. (*Id.*) Dr. Buck noted that McClendon complained of headaches since at least 2010, but that the headaches did not appear to be changing in severity, location, or frequency. (Tr. 1455.) He stated that

8

McClendon did not take medications regularly and did not have symptoms that suggested migraines. (*Id.*) Dr. Buck opined the headaches were related to stress, muscle tension, and neck posture. (*Id.*) He prescribed diclofenac 50 mg twice daily as needed and told him to set up a neurology evaluation. (*Id.*) In November 2016, McClendon requested Dr. Buck refill his diclofenac prescription. (Tr. 1452.) The records note no follow-up appointment was scheduled. (*Id.*)

McClendon presented to Dr. Lorri Lobeck, a neurologist, on February 14, 2017 for an evaluation at Dr. Buck's request. (Tr. 1441.) McClendon reported experiencing a "funny feeling" in his head that was difficult to describe—not frequent headaches, but rather an "abnormal" feeling as if his heart was pumping in his head. (Tr. 1441–42.) He reported that diclofenac seemed to help. (Tr. 1442.) McClendon also stated that he sometimes had phonophobia, but that this was not clearly linked to his headaches. (*Id.*) Given that McClendon's headaches were of "limited frequency," Dr. Lobeck did not recommend preventative therapy. (Tr. 1447.) However, she indicated that if symptoms worsened or failed to respond to periodic treatment with diclofenac, she would recommend a trial of sumatriptan. (*Id.*) A follow-up brain MRI was conducted on March 6, 2017 which was "essentially stable" from the previous June 2011 imaging. (Tr. 332.)

McClendon treated with Deanna Rusch, APNP, in neurology, on March 13, 2017. (Tr. 1393.) NP Rusch indicated that McClendon could not answer how frequently his headaches were occurring. (Tr. 1394.) When he was given options for frequency, he stated every other day. (*Id.*) McClendon stated that he took diclofenac, which sometimes helped and sometimes did not. (*Id.*) NP Rusch discussed options for treating McClendon's headaches, including switching his abortive therapy from diclofenac to sumatriptan. (Tr. 1397.) She also

9

suggested starting a preventative agent such as topiramate or propranolol. (*Id.*) McClendon's mother recommended trying the sumatriptan, which McClendon agreed to do. (*Id.*) During the June 2017 follow-up appointment, NP Rusch noted that the intensity of McClendon's headaches improved and he had two migraines per month. (Tr. 1373–74.) He reported having "light noise sensitivity at times." (Tr. 1374.) McClendon's mother wanted him to switch medications to rizatriptan, which McClendon and NP Rusch agreed. (Tr. 1377.)

McClendon next treated with Dr. Buck on March 19, 2019. (Tr. 347.) At this appointment, Dr. Buck noted that McClendon has been employed as a bagger at Pick N Save grocery store. (Tr. 348.) McClendon also reported daily headaches, poor sleeping, anxiety, and being startled by loud noises. (Tr. 349.) Dr. Buck suggested continuing acetaminophen as needed for headaches. (Tr. 350.) On April 2, 2019, McClendon left a message for Dr. Buck's nurse asking for a referral to an ear, nose, and throat doctor ("ENT") as "sounds have been very loud." (Tr. 1328.) McClendon treated with Dr. Robert Ciralsky, an ENT, on April 12. (Tr. 356.) He reported that since January, he "hears things in both ears" that sound "louder than they used to." (*Id.*) His right ear was worse than the left and he noted specific sensitivity to sounds at work such as the door closing. (Tr. 362.) A hearing exam showed normal hearing. (Tr. 357.) Dr. Ciralsky opined that McClendon may possibly have recruitment; however, noted that it is a neurologic disorder that was poorly understood and that there was no treatment except preventing exposure to loud noises or plugging the ears. (*Id.*) McClendon treated with Dr. Buck on April 18, 2019. (Tr. 373.) He reported continuing to startle easily with loud noises. (*Id.*)

On August 20, 2019, McClendon left a message with NP Rusch's office requesting an appointment as he was having headaches again. (Tr. 1292.) McClendon treated with NP

Rusch on August 28, 2019. (Tr. 419.) NP Rusch noted that McClendon last treated with her in June 2017 when he was averaging two migraines per month and switched from sumatriptan to rizatriptan for abortive therapy. (*Id.*) While McClendon stated that his headaches had become more frequent, he could not give a specific answer as to when the headaches increased. (*Id.*) After giving him options, McClendon agreed they had been worse since January. (*Id.*) He reported having daily headaches, but no longer took rizatriptan because he ran out. (*Id.*) He took Excedrin Migraine every day and reported sound sensitivity that might worsen with headaches. (*Id.*) NP Rusch recommended starting Topamax (topiramate) for preventative treatment and to cease taking Excedrin Migraine which was likely causing medication overuse headaches. (Tr. 422–23.) She restarted him on rizatriptan for abortive therapy, instructing him to take this medication for the more severe headaches that he reported occurred once per week. (Tr. 423.)

McClendon underwent a psychological examination on September 19, 2019 with Mark Pushkash, Ph.D. (Tr. 425.) Dr. Pushkash noted that McClendon began having headaches around age 20 and more recently developed a sensitivity to sound, causing him to wear earplugs or headphones to block out noise. (Tr. 425–26.) Upon mental status examination, Dr. Pushkash noted significant delays in McClendon's responses to questions, a blunted affect, and mildly depressed mood. (Tr. 427.) Dr. Pushkash opined that while McClendon had the intellectual capabilities to comprehend, recall, and follow through on instructions and that his ability to concentrate and persist on tasks was not significantly impaired, he found that McClendon would have marked difficulty relating appropriately to supervisors and coworkers because of his speech/language impairment. (Tr. 428.)

11

McClendon treated with Dr. Buck again on October 1, 2019. (Tr. 434.) Dr. Buck noted that McClendon took rizatriptan as needed for headaches with some relief but felt fatigue and dizziness on occasion after taking rizatriptan. (*Id.*) On October 7, McClendon treated with NP Rusch. (Tr. 439.) He reported experiencing daily headaches and had not noticed much difference since starting Topamax. (Tr. 440.) NP Rusch noted that McClendon was a poor historian and had problems telling her about his headaches. (Tr. 443.) She started him on naratriptan and decreased the rizatriptan to address the side effects of fatigue and dizziness. (*Id.*) NP Rusch also increased his Topamax. (*Id.*)

McClendon saw Dr. Lobeck in January 2020 regarding his heightened sound sensitivity. (Tr. 460.) She noted he continued to have headaches, but they did not persist all day. (*Id.*) McClendon stated that he wakes up with headaches that last two to three hours. (*Id.*) Dr. Lobeck opined that McClendon's heightened sound sensitivity could reflect a migrainous phenomenon or could be a behavioral response. (Tr. 461.) McClendon's topiramate was increased and Dr. Lobeck noted that it was encouraging that his headaches did not last the entire day. (*Id.*) McClendon followed up with Dr. Lobeck in March 2020. (Tr. 481.) He struggled to determine whether he had any improvement with the increased topiramate, to which Dr. Lobeck concluded that if he had improved, "he would have noticed and been able to tell me." (*Id.*) McClendon reported a list of multiple symptoms, including a warm feeling, heaviness, and mild throbbing in his head; fatigue; low energy; and hypersensitivity to sound, all of which were interfering with his ability to do activities. (*Id.*) Dr. Lobeck stopped the topiramate and started McClendon on amitriptyline. (Tr. 481–82.)

McClendon began treating with a new primary care doctor, Dr. Bruce Rowe, in June 2020. (Tr. 507.) He reported headaches with intermittent nausea and photophobia, noting

12

that he was taking amitriptyline and eletriptan. (*Id.*) Dr. Rowe referred McClendon to neurology for a brain MRI, continued him on his current medications, and noted he should consider Topamax for prophylaxis. (Tr. 508.) The updated brain MRI showed minimal/mild scattered periventricular and subcortical white matter signal abnormalities, nonspecific but favored to represent sequelae of chronic migraine headaches versus microvascular ischemic change. (Tr. 500.) In July, Dr. Rowe changed McClendon's medication regimen to Maxalt MLT when necessary for migraine and 25-50 mg of Topamax daily for migraine prophylaxis. (Tr. 504.) Dr. Rowe continued McClendon on the same medications in his August 21, 2020 visit. (Tr. 1761.) In September, Dr. Rowe increased McClendon's Topamax to 50 mg daily. (Tr. 1768.)

On March 15, 2021, McClendon treated with Dr. Rowe, reporting headaches upon waking for the last two to three weeks; however, he had not been taking his Topamax consistently which Dr. Rowe believed may be causing the recurrent headaches. (Tr. 1755.) McClendon was restarted on Topamax, and told he should continue using Maxalt when necessary, as well as ibuprofen. (Tr. 1756.) McClendon established care with ENT Dr. David Miyama in March 2021. (Tr. 1743.) Dr. Miyama noted that McClendon experienced chronic headaches for several years and that it was believed he had common migraine with phonophobia. (*Id.*) Dr. Miyama stated that McClendon had been on both rescue and maintenance medications and that his headaches continued to flare intermittently. (*Id.*) In July 2021, Dr. Miyama noted McClendon had some significant hyperacusis bilaterally, reporting that he started wearing earplugs because of this. (Tr. 1829.) Dr. Miyama opined that the earplugs were likely contributing to his hyperacusis, and McClendon was instructed on sound enrichment, as well as less occlusive ear plugs. (Tr. 1830.)

13

On April 1, 2022, McClendon again treated with Dr. Rowe. (Tr. 1808.) He noted rizatriptan had worked well for his headaches, but he continued to experience some sound sensitivity. (*Id.*) He seemed to react poorly to any new or consistent sound in his environment. (*Id.*) Dr. Rowe suggested McClendon try masking techniques such as soft music at night for his hyperacusis. (Tr. 1810.) McClendon returned to Dr. Rowe on May 2, 2022, reporting unilateral, left-sided tightening headaches without radiation. (Tr. 1804.) He was taking rizatriptan or anti-inflammatories as needed. (*Id.*) Dr. Rowe suggested McClendon consider continuing Maxalt MLT as needed for severe pain and using naproxen or Excedrin Migraine as needed as well. (Tr. 1806.) On July 13, 2022, McClendon reported to Dr. Rowe that he was taking Maxalt MLT as needed for severe pain and used naproxen or Excedrin Migraine as needed as well. (Tr. 1799.) These medications provided temporary relief of his headache symptoms. (*Id.*) His current medications were continued. (Tr. 1801.) By September 2022, McClendon reported to Dr. Rowe that Maxalt MLT worked well for his headaches (Tr. 1790) and he was told to continue it as needed (Tr. 1792).

On December 1, 2022, McClendon reported to his treating therapist, Vladislav Solc, LPC, that he was taking Excedrin for headaches and noted that the sound in his ears continued to bother him. (Tr. 1002.) On December 16, 2022, McClendon reported to Dr. Rowe that he had discontinued his mirtazapine though he was not sure why, but was back to having difficulty sleeping, going to bed late, having headaches, having daytime sleepiness, and feeling anxious. (Tr. 1783.) Dr. Rowe did not, however, list headaches or migraine as part of McClendon's continuing assessment/plan. (Tr. 1785–86.)

At the March 2023 administrative hearing, McClendon testified that he experienced daily headaches (Tr. 558) that sometimes last all day (Tr. 559). He testified that he takes

Excedrin every day and takes rizatriptan if the headache is really bad. (*Id.*) McClendon testified that he is unaware of any headache triggers. (Tr. 560.) As to his noise sensitivity, McClendon testified that he hears sounds louder than normal and certain sounds, such as doors closing, banging sounds, or things with high pitches (like silverware) particularly bother him. (*Id.*)

### 2.2    Failure to Account for Limitations in RFC Assessment

McClendon argues the ALJ failed to account for all of his limitations in his RFC assessment. Specifically, he argues the ALJ failed to fully account for his headache-related limitations, his hypersensitivity to sound, and his limitations in the quality of social interactions.

RFC is the most the claimant can do in a work setting "despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); *see also* 20 C.F.R. § 416.945; Social Security Ruling ("SSR") 96–8p. In assessing McClendon's limitations, ALJ Gendreau agreed that McClendon's headaches, sound sensitivity disorder, and mental and cognitive disorders caused work-related limitations; however, he concluded that McClendon was not as limited as he asserts. (Tr. 530.)

### 2.2.1    Headaches

McClendon does not contend that ALJ Gendreau failed to include any limitations in the RFC to account for his headaches; rather, he argues that the RFC restrictions are insufficient. (Pl.'s Br. at 10.) Specifically, he argues that his treatment records, as well as his and his mother's testimony, "all show that McClendon is unable to get out of bed at least once each week as a result of his more severe headaches." (Pl.'s Reply Br. at 3, Docket # 19.) He further argues that because ALJ Gendreau stated that Linder McClendon's "description

15

of the effect of the claimant's headaches is consistent with the claimant's reports to his treatment providers," (Tr. 541), this means that the ALJ "therefore found that the record establishes that McClendon cannot get out of bed at least once each week" yet failed to include a corresponding limitation in the RFC. (Pl.'s Reply Br. at 3.)

McClendon's argument is based on a false premise. The record does not support that McClendon is bedridden once a week due to headaches. He relies principally on his mother's testimony at the October 2020 administrative hearing as support for this premise. Linder McClendon was asked whether she saw evidence of her son's headaches, to which she responded, "Yeah, sometime he just can't do nothing. He wakes up weak and he says some time he's just tired." (Tr. 54.) When asked how often this happens, she responded "probably once a week." (*Id.*) While McClendon argues that this supports the conclusion that he is bedridden once per week, Linder McClendon's statement is ambiguous at best.

McClendon further cites to various portions of his own testimony from the 2020 and 2023 hearings to create a patchwork that he contends supports the assertion that he is bedridden once a week. He first cites to his October 2020 testimony that when he takes the abortive medication rizatriptan, it makes him drowsy and he has to lie back down in bed. (Pl.'s Br. at 9, citing Tr. 44, 46.) He then cites to his 2023 testimony that sometimes his headaches "don't go away," even with rizatriptan. (*Id.*, citing Tr. 559.) These two pieces of testimony, however, do not add up to McClendon testifying that he cannot get out of bed for an entire day. In fact, when asked at the 2020 hearing if the rizatriptan does not work, "do you still have to stay lying down, or do you still try to do things?," to which McClendon responded, "I still try to do things." (Tr. 46.) When asked what kinds of things he does, even

if he has a headache, McClendon testified that he does chores around the house such as washing dishes and vacuuming the floor. (*Id.*)

McClendon also asserts that his treatment records support an inability to get out of bed once a week (Pl.'s Reply Br. at 3) but does not cite to any specific records. Perhaps he refers to the August 2019 record in which McClendon reported to NP Rusch that once a week he will experience a headache at 8 out of 10 severity on the pain scale. (Tr. 419.) But again, he did not state that he was bedridden when that occurred. Further, at that time, he was *not* taking his rizatriptan because he ran out. (*Id.*) NP Rusch instructed him to restart rizatriptan for "the more severe headaches which are occurring once a week." (Tr. 423.) And in September 2022, his treating physician Dr. Rowe stated that Maxalt (rizatriptan) has "worked well for his headaches." (Tr. 1790.)

Both parties argue over a phantom finding—McClendon argues ALJ Gendreau adopted Linder McClendon's statement that her son is bedridden once a week from headaches (Pl.'s Reply Br. at 4) and the Commissioner argues that the ALJ rejected McClendon's testimony that "he could not get out of bed once per week" (Commissioner's Br. at 7, Docket # 18). But ALJ Gendreau cannot accept or reject testimony that did not occur and evidence that does not exist. In reality, what the ALJ considered was Linder McClendon's statement that once a week her son wakes up "feeling weak and tired due to headaches." (Tr. 541.) This is the statement he found was of "some persuasive value" because Linder lives with McClendon and thus observes his activities, as well as because her statements were consistent with reports to his treatment providers, citing to records that indicate generalized weakness and poor sleep. (*Id.*, citing B9F/13 (Tr. 349), B14F/24 (Tr.

453).) McClendon does not otherwise argue ALJ Gendreau erred in assessing limitations for his headache symptoms. Thus, I do not find he erred in this regard.

### 2.2.2 Hypersensitivity to Sound

In early 2019, McClendon began reporting being startled by loud noises, as well as hearing sounds in his ears louder than normal. (Tr. 349, 1328.) McClendon treated with two different ENTs, who surmised that McClendon may suffer from recruitment[1] (Tr. 357) or hyperacusis[2] (Tr. 1829). His treating neurologist, Dr. Lobeck, opined that his heightened sound sensitivity "may reflect some migrainous phenomena" or it "also could be a behavioral response." (Tr. 461.) At the initial level, State Agency physician Dr. Marc Young opined that McClendon should avoid concentrated exposure to noise due to his sound sensitivity. (Tr. 73–75.) State Agency physician Dr. Stephanie Green affirmed this restriction at the reconsideration level. (Tr. 95–96.) ALJ Gendreau found these opinions generally persuasive, noting that McClendon's "difficulty with loud noises and headaches associated with phonophobia [were] documented throughout the record." (Tr. 537.) Thus, McClendon's RFC restricted him to work "in no more than a moderate level of noise." (Tr. 529.)

McClendon argues that this restriction does not sufficiently address his hyperacusis. (Pl.'s Br. at 12.) He argues that ALJ Gendreau failed to explain why he believed a restriction to "moderate" noise levels would accommodate his hyperacusis. He further states that the SSA defines "moderate" noise as commensurate with the noise level in a "department or grocery store" but argues McClendon quit his grocery store job because of the noise level. (*Id.*

---

[1] Recruitment is defined as "the abnormally greater increase in loudness in response to increments in intensity of the acoustic stimulus in an ear with a sensory hearing loss compared with that of a normal ear." Recruitment, Stedmans Medical Dictionary 765700.
[2] Hyperacusis is the "[h]eightened sensitivity to sound, with aversive or pained reactions to normal environmental sounds." Hyperacusis, Stedmans Medical Dictionary 422100.

at 13.) McClendon argues that because of his hyperacusis, even noises that are not considered "loud" to others seem loud to him. (*Id.* at 13–14.) Finally, he argues that to the extent the ALJ adopted the State Agency physicians' opinions, he failed to explain why he did not include a limitation to "concentrated" exposure to noise as they opined. (*Id.* at 14–15.)

Considering McClendon's last argument first, ALJ Gendreau found that the opinions of the two State Agency physicians, who opined that McClendon should "avoid concentrated exposure to noise" was generally persuasive because of his difficulty with loud noises. (Tr. 537.) In the RFC, however, McClendon was limited to jobs with "no more than a moderate level of noise." (Tr. 529.) McClendon argues that the ALJ failed to explain how a limitation to "moderate" noise encompasses a restriction from "concentrated" exposure to noise. He argues that "concentrated" restricts the quality of the noise exposure, not the volume of noise McClendon could tolerate. (Pl.'s Br. at 14.)

I am unconvinced. State Agency consultants are asked to measure a claimant's environmental limitations on the following scale: unlimited, avoid concentrated exposure, avoid even moderate exposure, or avoid all exposure. *See, e.g.*, *Glover v. Berryhill*, No. 16C5607, 2017 WL 2506411, at *8 (N.D. Ill. June 9, 2017); *Ilioff v. Saul*, No. 1:19CV1226, 2021 WL 848204, at *9 (M.D.N.C. Mar. 5, 2021). And as one district court found, a limitation to avoid concentrated exposure did not conflict with a DOT job description that required frequent exposure, because the first term refers to the quantity or magnitude, whereas the second refers to frequency or proportion of time that a condition may be present. *See Sanchez v. Colvin*, No. 13-CV-929 MKB, 2014 WL 4065091, at *17 (E.D.N.Y. Aug. 14, 2014). In other words, "concentrated" does refer to the intensity or magnitude of the exposure. Given the scale used to measure environmental limitations, it stands to reason that a restriction to

moderate noise levels necessarily encompasses "avoid concentrated exposure," the less restrictive level before "avoid even moderate exposure."

McClendon further argues that due to his hyperacusis, his definition of "loud" is subjective. (Pl.'s Br. at 13.) Thus, sounds that are loud to him may not seem loud to others. (*Id.* at 14.) Although McClendon does, at times, describe a hypersensitivity to sound in general, when asked what sort of noises specifically caused him difficulty, McClendon consistently described objectively loud noises, such as doors closing (which he described as a "door slamming or something similar" in an April 2020 record), banging sounds, and things with high pitches. (Tr. 560.) And he consistently described these noises as creating a heightened startle response, making him anxious, scared, or "jumpy." (Tr. 43–44, 50, 191, 196, 234, 239, 494.) In other words, it seems the record supports that a limitation to a work environment with moderate noise levels would sufficiently account for his limitations.

McClendon also argues, however, that the Social Security Administration's Program Operations Manual System ("POMS"), specifically gives as an example of a "moderate" level of noise a grocery store, POMS DI 25001.001(A)(50), and McClendon quit his grocery store job because of noise. But it was not the general noise level of the store that bothered him but slamming of car doors in the parking lot (Tr. 43, 191, 565) or the store's door shutting (Tr. 565). McClendon also contends that even when performing his everyday chores, he wears headphones or earplugs. (Pl.'s Reply. Br. at 5.) While the record supports that McClendon occasionally wore headphones or earplugs, especially while sleeping (Tr. 192, 568), the record does not support that McClendon wears earplugs constantly or can only tolerate being in quiet environments. He testified that he "sometimes" wears earplugs (Tr. 561) and his doctor opined that earplugs actually worsened his condition, so if he uses earplugs, they should be

less occlusive (Tr. 1830). Thus, the RFC limitation to a workplace with a moderate noise level is supported by substantial evidence.

### 2.2.3 Social Interactions

McClendon argues the ALJ failed to properly include limitations in social interactions in the RFC. Specifically, State Agency consultant Dr. Elpidio Mariano opined that because of McClendon's anxiety and speech difficulties, he would be best suited for a job with minimal public and superficial co-worker and supervisor interactions. (Tr. 76.) ALJ Gendreau found Dr. Mariano's opinion partially persuasive, concluding that the evidence regarding McClendon's difficulty communicating with and being around others supported a limitation to occasional interaction with supervisors, coworkers, and the public. (Tr. 537–38.) Specifically, he included in the RFC a limitation to occasionally interact with supervisors and co-workers and have fleeting or incidental contact with the general public, but no public facing work. (Tr. 529.) McClendon argues that the ALJ did not dispute the portion of Dr. Mariano's opinion regarding having superficial interactions with co-workers and supervisors, but only included a limitation regarding the frequency, not the substance, of the interactions with co-workers and supervisors. (Pl.'s Br. at 16.)

McClendon fails to demonstrate how the ALJ erred. First, ALJ Gendreau did not wholesale adopt Dr. Mariano's opinion. Rather, he specifically found it only partially persuasive and noted that the opinion was not entirely consistent with the record as a whole. (Tr. 537.) While the ALJ acknowledges McClendon's difficulties in communicating, he also cites multiple records indicating that McClendon had consistently been described as cooperative, pleasant, and conversant, with good eye contact. (Tr. 538, 540.) The ALJ also cites to the fact McClendon can grocery shop, socialize with others, and has a few friends that

he occasionally spends time with. (Tr. 541.) Thus, it is clear the ALJ did not adopt the portion of Dr. Mariano's opinion recommending superficial co-worker and supervisor interactions when he stated that the evidence supports a limitation to occasional interaction with supervisors and coworkers. (Tr. 538.)

Furthermore, McClendon has not shown that he is more limited than what ALJ Gendreau assigned in the RFC. In his two Adult Function Reports, McClendon indicated that he has no problems getting along with family, friends, neighbors, or others. (Tr. 196, 238.) When asked how well he gets along with authority figures, he states "I get along with them well." (Tr. 197, 240.) In his March 2020 Function Report, McClendon stated that he goes to church, the store, and the doctor's office on a regular basis, as well as plays video games and goes places with friends once a month. (Tr. 238.) Thus, I do not find the ALJ erred in this regard.

### 2.3    Evaluation of Subjective Symptoms

Finally, McClendon argues that the ALJ improperly discounted his allegations regarding the nature, severity, and limiting effects of his subjective symptoms.

The Commissioner's regulations set forth a two-step test for evaluating a claimant's statements regarding his symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors,

including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id.*

In discounting the severity of McClendon's subjective symptoms, ALJ Gendreau cited to McClendon's ability to perform his activities of daily living, including housecleaning and yardwork, going to the grocery store, performing self-care activities such as dressing and bathing, socializing with others, driving, managing his finances, and displaying sufficient concentration and attention to follow television programs, play video games, work on a computer, read comic books, draw, learn to sew and develop a video game. (Tr. 535.) The ALJ also considered the fact that McClendon was able to obtain a postsecondary applied science degree. (*Id.*)

As to his activities of daily living, McClendon argues the ALJ "failed to mention that while McClendon does continue to help clean the house, he only does so on the days that he is not forced to lie down again because of a severe headache and, "when he does do work around the house, it does not last for longer than 20 minutes to an hour." (Pl.'s Br. at 18.) McClendon further argues that his social activities are rare and he has stopped working on his video game development. (*Id.*) But the very record citations McClendon points to in support of his argument undermine his alleged limitations. He testified that even when he has a headache he does not "stay lying down," but tries to do things despite the headache, such as wash dishes and vacuum. (Tr. 46.) In his two Adult Function Reports, he stated that he

was able to clean and do laundry and went outside every day. (Tr. 193, 236.) And McClendon

did not state that he only works for 20 minutes to an hour because of his limitations; rather,

he indicates that it takes him about 20 (Tr. 236) or 30 minutes (Tr. 193) to clean and do

laundry. In his more recent Function Report, he further indicated that he could shovel snow

and mow the lawn. (Tr. 236.) Nor do the records indicate that his social activities are "rare."

McClendon indicates that he goes to church once a week, to the store twice a week, and to

his doctors' offices as needed. (Tr. 238.) In addition, he plays video games and goes places

with friends about once a month. (*Id.*)

McClendon further argues ALJ Gendreau did not account for the fact that he wears

headphones or earplugs while performing his chores and quit his bagger job due to sound

sensitivity. (Pl.'s Br. at 18.) However, as stated above, the record does not support the constant

use of headphones or earplugs while performing activities of daily living as McClendon now

asserts. Rather, he testified that he "sometimes" wears earplugs (Tr. 561) and his doctor

opined that earplugs actually worsened his condition, so if he uses earplugs, they should be

less occlusive (Tr. 1830). Further, the ALJ did address the fact that McClendon "has never

held a full-time job" and that "he was not able to remain at his last job because of headaches,

anxiety and difficulty concentrating." (Tr. 530.)

McClendon also argues the ALJ failed to consider all six years of notes from his

Wisconsin Division of Vocational Rehabilitation records showing that he had difficulty

performing cleaning jobs (the ultimate job the ALJ found McClendon could perform) (Pl.'s

Br. at 19–20; Pl.'s Reply Br. at 9, 11–12) and overemphasized his ability to obtain a post-

secondary degree, which he obtained prior to the worsening of his headaches in 2019 (Pl.'s

Br. at 18). Neither of these pieces of evidence, however, are particularly significant as both

occurred before McClendon's application date, as well as before McClendon's asserted worsening in January 2019. (Tr. 770–986.) While it is true that ALJ Gendreau only mentions the final DVR record from January 2018 closing McClendon's case after he was employed for over 90 days (Tr. 531, 981–82), he does not otherwise rely solely on this piece of evidence to discount McClendon's subjective symptoms. Nor does he rely solely on the fact that McClendon was able to attend post-secondary school and obtain a degree.

McClendon further argues that the DVR records show that he "is demonstrably unfit for cleaning work." (Pl.'s Br. at 20.) McClendon attempted two cleaning jobs in 2012 and 2014. While his job coach felt that McClendon would not do well as a cleaner permanently (Tr. 872), this does not mean that he is "demonstrably unfit" for cleaning work. Rather, during this same period, McClendon's mother stated that the 2012 cleaning job went well for him (Tr. 320) and that on the days when he was not at school, he did "quite a bit of work around the house," including "most of the house cleaning" (Tr. 319). McClendon stated that he enjoyed cleaning the house. (Tr. 321.) Further, as recent as 2020, McClendon stated that he was able to do household chores such as cleaning, ironing, laundry, snow shoveling, and mowing. (Tr. 236.)

Thus, I do not find the ALJ erred in his evaluation of McClendon's subjective symptoms.

## CONCLUSION

McClendon argues that the ALJ's decision finding him not disabled is contrary to the substantial evidence in the record. For the reasons explained above, I find that the ALJ's decision in this case is well supported by the substantial evidence in the record. The Commissioner's decision is affirmed. The case is dismissed.

25

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of October, 2024.

BY THE COURT

NANCY JOSEPH
United States Magistrate Judge